No. 25-1566

_____

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FOURTH CIRCUIT

_____

Blagomir P. Shkodrov, Individually and as Personal Representative of

Stoyanka Dimitrova Shkodrova/Decedent,

Petra D. Fist, as Personal Representative of Decedent,

Plaintiffs-Appellants,

v.

Summer Carmichael, Outer Banks Health, Inc., ECU Health/EastCare, Inc.,
Chesapeake Hospital Authority, Inc., University Health Systems of Eastern
Carolina, Inc., Jeff Peter Vista, Linda Smith, Aaron Heide, James Heaton, Jennifer
Allen, Susanj Patel, Simone Patalinghug Montoya, Eastern Radiologists, Inc.

Defendants-Appellees.

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA, RALEIGH, NC

_____

## APPELLANTS' INFORMAL REPLY BRIEF

### To Response Brief by Appellees

## SUSANJ PATEL, SIMONE PATALINGHUG MONTOYA,

## and EASTERN RADIOLOGISTS, INC.

_____

Petra D. Fist, Blagomir Shkodrov

Mailing Address: 1209 Kirkwood Hwy., Wilmington, DE 19805

Email: pdkfist1@gmail.com; Email: levski0777@gmail.com

Tel. 302-525-9302; Tel. 954-854-1912

**TABLE OF CONTENTS**

I. INTRODUCTION ..............................................................................................3

II. SUMMARY OF REPLY ...................................................................................3

III. REPLY TO APPELLEES STATEMENT OF THE CASE AND
ARGUMENT .......................................................................................................4

1. APPELLEES' MISCHARACTERIZATIONS OF FACTUAL
ALLEGATIONS AND PROCEDURAL HISTORY ...........................................4

2. CIVIL CONSPIRACY, FRAUD, OBSTRUCTION OF JUSTICE ..............10

3. NOT SUBSUMED CLAIMS...........................................................................19

IV. CONCLUSION .............................................................................................22

CERTIFICATE OF COMPLIANCE ..................................................................22

CERTIFICATE OF SERVICE ...........................................................................23

## I. INTRODUCTION

Plaintiffs/Appellants have alleged that the individual Radiology Defendants (Dr. Patel, an abdominal radiologist and not a neuroradiologist and Dr. Montoya, an inexperienced neuroradiologist) rendered substandard care and in a civil conspiracy with the Defendant Heide and the OBH individual Defendants further engaged in civil obstruction of justice and fraud to cover the Decedent's grossly negligent care. As to Eastern Radiologists, Inc., Appellants have alleged liability[1] in respondeat superior as well as corporate negligence and negligent supervision.

## II. SUMMARY OF REPLY

Appellees mischaracterize Appellants' factual allegations and procedural history. Regardless, Appellants, the sole beneficiaries of their Mother's de jure estate without any actual creditors, can proceed pro se. Appellees' misrepresentations and omissions, rendered in agreement with the OBH defendants, equitably precludes them from pleading a statute of limitations defense. While claims related to the Decedent's medical care may be subsumed under the wrongful death claim, other claims like gross negligence as to clinical documentation, record-keeping, health record maintenance, corporate negligence/ negligent supervision on reasonable care for medical records (including prevention

---

[1]Plaintiffs have not alleged EMTALA violations against Eastern Radiologists, Inc. or any individual defendant. DE 100 ¶ 108.

policies, measures and procedures for prevention of critical deficiencies or falsification of the records), negligence in respondeat superior for the latter, in addition to civil obstruction of justice, fraud and infliction of emotional distress, remain separate, un-subsumed claims.

## III. REPLY TO APPELLEES STATEMENT OF THE CASE AND ARGUMENT

## 1. APPELLEES' MISCHARACTERIZATIONS OF FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

Appellees attack[2], undercut and mischaracterize both Appellants' factual allegations and the procedural history below. In its "statement of the case," Defendants' brief omits Plaintiffs' factual allegations about Appellees fraud and civil obstruction of justice civil conspiracy with Defendant Heide and the OBH Defendants and any other claim not arising out of the Decedent's medical care. App. Br. at 9 (a lawsuit arising strictly out of medical care; page number references as assigned by the CM/ECF system). For the Appellees, like the rest of the

---

[2] Even offensively labeling Appellants' extremely detailed complaint (precise time is critical in stroke cases and fraud allegations require particularity) to be "hodgepodge of claims." App. Br. 11. Granted, English is not Appellants' first language, it's their third and sixth language, respectively, but their complaint is hardly a bunch of unrelated and even contradictory claims or a bunch of incoherent sentences hard for Appellees to grasp.

Defendants and the district court, Plaintiffs' factual allegations stop at paragraph 35, with the limited exceptions of citing something positive done by a defendant, e.g. Defendants Patel or Montoya performed a test, or to be used against Plaintiffs. Appellees continue to effectively maintain that detailed and clear factual allegations not inserted in section "Factual Background" of the complaint do not exist. Due to the complex and egregious nature of this case, Plaintiffs included clear, detailed factual allegations under every claim they pled, incorporating prior allegations by reference where feasible. Yet, for Appellees (or the court) these allegations simply vanished (just like the Decedent's brain).

As to mischaracterizations, Appellees label Plaintiffs' fraud and civil obstruction of justice factual allegations (derived from the actual medical records) as "critiques" or "conclusory opinions," which are always lumped together with allegations of Appellees co-conspirators. Appellees go so far as to misrepresent: "Plaintiffs expressly pleaded that Shkodrova's estate has creditors. They stated that the estate has "medical debt creditors related to [Shkodrova's] death," although they disputed the validity of some claims. [DE 100 at 3 (¶ 1)]." App. Br. at 26. This is what the complaint states, without stringing words out of context: "The Decedent does not have any known creditors, other than medical debt creditors related to her death with either paid off, disputed or invalid claims." DE 100 ¶ 1, p. 3. This is what this sentence means in plain English: **"The Decedent does not**

**have any known creditors...**" indicates there are no outstanding debts to individuals, businesses, or organizations that the deceased owed money to; **"...other than medical debt creditors related to her death..."** clarifies that the only debts the estate might be responsible for are those arising from the decedent's final medical expenses; **"...with either paid off, disputed, or invalid claims."**—this further specifies that even these medical debts are not necessarily a problem for the estate. They could be P**aid off**: The medical bills have already been settled; **Disputed**: The estate or a responsible party is challenging the validity or amount of the medical bills; **Invalid**: The medical bills are not legally or legitimately owed, possibly due to errors or other issues. In summary, this sentence means that the person who died doesn't owe anyone money except for maybe their final medical bills, and even those may not be owed anymore. Moreover, Appellees, and the court (that's why the court avoided the word "creditor") knew perfectly well that Appellants were referring to their mother's medical bills and potential creditors: "When my Mother was terminated, we received bills from the following medical providers involved in her death." (followed by listing every one of Defendants' medical bills); "My Mother died without any real estate debt, credit card debt, tax debt, or insurance debt….We had to form an estate to file this law suit. My sister and I are the sole beneficiaries of my mother's estate. To the best of my knowledge, there aren't any creditors with valid, undisputed medical debt or any

other valid, undisputed debt. My Mother died under extremely egregious circumstances…. When my Mother was wrongfully deprived of her life, we received bills from these medical providers involved in her death: Vidant Health[3] and affiliates and CRMC and affiliates. I have not seen any of these bills in 2024. I have disputed all of these bills that helped exterminate my mother. Under the new North Carolina medical program, signed into law by governor Cooper, the hospitals that wronged my mother get to be paid after all." DE 97. In their Memorandum of Law regarding the pro se issue, Appellants wrote: The current issue impeding the orderly administration of this case is whether Plaintiffs can represent their mother's de jure estate if there are providers of the Decedent's "care" with disputed bills….There is no money in this estate for any potential creditor of the estate to claim. Any settlement proceeds from this action will not become assets of the paper estate, because in North Carolina wrongful death proceeds are recovery and not assets—they are not part of the estate and not subject to creditors' claims….Given the fictitious nature of their mother's paper estate and the fact that no settlement proceeds would be considered assets reachable by creditors, Plaintiffs are in essence representing their own interests…. Defendants are confused if they believe that Plaintiffs are litigating on Defendants'

---

[3] Vidant Health is the former fictitious name for Univ. Health Systems of Eastern Carolina, now ECU Health, a partner-owner of the Outer Banks Hospital, together with CHA/ CRMD, and owner/manager of EMS EastCare.

behalf or on behalf of providers who have utterly failed to render any necessary

treatment (rather than keeping a body on a breathalyzer to put more distance

between the OBH's abysmal failure to care for their patient and the patient's time

of death at the co-partner's CRMC)….The Fourth Circuit Court of Appeals has not

entered a precedential decision that directs this Court to dismiss an action by a

personal representative of an estate with creditors, especially potential creditors

holding disputed, potentially invalid claims—it does not make much sense to

undertake payment of the bills of a medical provider who had caused and/or

contributed to the death of Plaintiffs' mother….Contrary to CHA's attorney, who

insists on dismissal of Plaintiffs' estate claims "without any further analysis"

because there might be creditors with or without valid claims, other Circuit Courts

of Appeals who have entered decisions on the issue of creditors and personal

representative's capacity to sue under particular circumstances, have done so in

jurisdictions where the lawsuit proceeds would be assets of the estate so that to

protect the existing interests of a third party with legitimate claims…. Dismissing

Plaintiffs' wrongful death claim, at the outset of the proceedings and before any

discovery has been had, on the generalized premise of prohibited pro se litigation

in any and all cases in any and all jurisdictions where there might be creditors with

or without legitimate claims would not serve the interests of justice in this case.

Wherefore, Plaintiffs pray that this Court schedule a 26(f) conference and allow the

parties to proceed." DE 97. With this knowledge and on this record, Appellees frivolously misrepresent: "Plaintiffs expressly pleaded that Shkodrova's estate has creditors." App. Br. at 26.

Appellees further mischaracterize the procedural history below, e.g. "submitting some attempted amendments and being ordered to file a corrected amended complaint….", when Appellees know that Plaintiffs amended[4] their complaint once (as a matter of right) without including the original complaint and then, months later, were ordered to correct the formatting error and merge the original and amended complaint. App. Br. at 11 (Appellees frivolously and vehemently contested against amending Plaintiffs' complaint amendable as a matter of right). It is further frivolous to argue that the district judge was impartial because she "allowed" Appellants to amend their complaint. *Id*. at 40.

Having mischaracterized Appellants' factual allegations and the procedural history below, Appellees then maintain (like the rest of the Defendants) that they've done nothing wrong. After hundreds of hours of careful reviews, Appellants have specifically alleged otherwise.

---

[4] Adding 4 causes of action, constructive fraud, negligent infliction of emotional distress and corporate negligence/negligent supervision, without additional defendants. It was not Appellants' choice that their Mother died at the hands of 5 different providers at 3 states (Heide appeared from a 3rd state).

## 2.     CIVIL CONSPIRACY, FRAUD, OBSTRUCTION OF JUSTICE

"He who hunts with the pack is responsible for the kill." State v. Lee, 277 N.C. 205, 208, 176 S.E.2d 765, 770 (1970). "If two or more persons conspire or agree to engage in an unlawful enterprise, each is liable for acts committed by any of them in furtherance of the common design and the manner or means used in executing the common design." *Newton v. Barth*, 284 N.C. App. 331, 343 788 S.E. 653, 663 (2016) (quoting *Curry v. Staley*, 6 N.C. App. 165, 169, 169 S.E.2d 522, 524 (1969)). "Second, the plaintiff must prove that one or more of the parties to the agreement committed an overt act in furtherance of the aims of the agreement. An overt act is an act which could be neutral in its character, but which is evidence of affirmative action showing an intent to accomplish or further the object(s) of the alleged conspiracy. [And] Third, the plaintiff must prove that the overt act(s) committed in furtherance of the conspiracy [was] [were] a proximate cause of [injury] [damage] to the plaintiff….The basis of a conspiracy is an agreement or understanding[5] between two or more persons. An agreement or understanding

---

[5] Implied agreement is gathered by implication or necessary deduction from the circumstances or the conduct of the parties. Tacit agreement indicates assent **in** silence or acquiescence. The word "tacit" means indicated but not actually expressed; existing, inferred, or understood by the parties without being openly expressed or stated, assent indicated in silence or acquiescence. Conspiracies involving elaborate arrangements generally are not born full-grown. Rather they mature by successive stages which are necessary to bring in the essential parties. And not all of those joining at the early stages make known their participation to others coming in later. It is therefore sufficient to show the essential nature of the

between two or more persons exists when they share a commitment to a common scheme. To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement. The agreement itself may have been entirely unspoken. A person can become a member without full knowledge of all of the details of the conspiracy, the identity of all of its members, or the parts such members played in the charged conspiracy. The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose. To prove a conspiracy existed, the evidence must show that the alleged members of the conspiracy came to an agreement or understanding among themselves to accomplish a common purpose…. Direct evidence of an agreement may not be available, and therefore a conspiracy also may be shown through circumstantial evidence…. In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal." N.C.P.I.— Civil 103.31.

---

plan and the conspirators' connections with it, without requiring evidence of knowledge of all its details or of the participation by others. Secrecy and concealment are common features of a successful conspiracy, and therefore, participation in a conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and putting together of circumstances, and the conspiracy may be shown by circumstantial evidence or permissible inferences form the facts.

Defendant Patel, an abdominal radiologist, undertook the Decedent's rad exam, crucial for a documented, standard tPA decision, to rubber-stamp Defendants' Carmichael and Vista pre-made decision of acute stroke. The purpose of the rad exam is to look for occlusions/clots that block oxygen flow to the brain (there were none in the Decedent's case) and to look for any brain bleeding—current brain bleeding is an absolute contraindication for tPA and even a history of intracranial hemorrhage is typically considered an absolute contraindication for tPA because tPA, a potent blood thinner, would significantly increase the risk of expanding brain hemorrhages. In agreement with Carmichael and other OBH Defendants, Defendant Patel omitted critical information from his rad exam about "any brain bleeding" or the lack of any observed clots to confirm a pre-made tPA decision. After the Decedent lost consciousness, Defendant Patel, the OBH Defendants and Heide feared Appellants or anyone else might uncover their gross negligence and/or fraud (Defendant Patel has rendered a negligent rad exam, the OBH Defendants have created false NIH tests and scores, Defendant Heide had created a false neuro report, all for scoring[6] a stroke patient and proceeding with the tPA), Defendant Patel in agreement with either Vista, Carmichael, Smith, Allen

_____

[6] Plaintiffs have repeatedly alleged that the OBH was interested in having a stroke patient to be able to maintain their certification as an Acute Ready Stroke Hospital and the Decedent, a foreign-born, unsured patient, seemed a perfect candidate.

or Heide, proceeded to falsify a rad exam of the Decedent's chest x-ray while concealing several other chest x-rays.

According to the OBH excised records, these are the Decedent's alleged taken chest x-rays (only 1-view)[7], still remaining on the face of the record: **1**) at 20:50 by Snead chest X-ray 1-view, ID 503143624; **2**) at 22:00 by McGee chest X-ray 1-view; **3**) at 22:04 Chest Xray Portable - ID: 59192822; **4**) at 00:05 chest X-ray, ID 503150180, reason: post-intubation ONLY; **5**) at 00:07 New chest X-ray 1-view; 6) at 00:18 chest X-ray 1-view ID: 59192966, resulted at 00:18.

At 22:09, the time Patel analyzed the 20:50 pre-tPA chest x-ray, falsely claiming it to be a post-tPA chest x-ray (a non-existent 21:46 chest x-ray) while concealing at least 2 (two) post-tPA chest x-rays to find lack of significant problems: "Frontal chest was obtained at 2146 hours… Borderline enlarged heart." At 21:47, one minute after Patel's false 21:46 chest x-ray which showed no significant problems, the Decedent's her troponin levels were 4 times higher than normal, her heart rate was at least 104, her ECG was abnormal, BP her blood pressure was 184/83. DE 100 ¶ 29. The records further indicate that Patel indeed analyzed the 22:04 chest x-ray, which Patel fraudulently concealed.

---

[7] A test repeatedly good enough test for a patient in full crisis.

Defendant Montoya stepped into Defendants' scheme (Patel, Vista, Carmichael, Smith, Allen, Heide) at about 22:25 and misleadingly analyzed some of the Decedent's CTA scans. According to the OBH excised records, these are the Decedent's alleged taken CT and CTA scans still remaining on the face of the record: **1**) at 20:51 by McGee CT head w/o iv contrast; **2**) at 20:57 by Boehmer CT head w/o iv contrast; **3**) at 21:35 by McGee CTA head with & w/o iv contrast (ordered at 21:28 by Vista), ID 503143635; **4**) at 21:35 by McGee CTA neck with & w/o iv contrast (ordered at 21:28 by Vista ID 503143636; **5**) at 22:04 by McGee CTA head with & w/o iv contrast T; **6**) at 22:04 by McGee CTA neck with & w/o iv contrast; **7**) at 22:06 by unknown CTA head with & w/o iv contrast - ID: 59192856 ; **8**) at 22:06 by unknown CTA neck with & w/o iv contrast ID: 59192858; **9**) at 22:17 by McGee CT head with & w/o iv contrast ID 503143659, ordered by Vista at 22:08; **10)** at 22:35 by unknown "CT HEAD W/O IV CONTRAST.[8]

At about 22:47, Montoya last updated her results on the CTA head scan, which showed the Decedent's profuse brain bleeding: "There is now been hemorrhagic conversion[9] of a large right PCA territory infarct involving the medial

---

[8] Vidant Health produced 4 (four) of these.
[9] Defendant Montoya misleadingly labeled the Decedent's hemorrhaging "a hemorrhagic conversion" when she did not analyze or find that the Decedent had an ischemic stroke that converted to hemorrhagic stroke after the tPA.

temporo-occipital lobes and occipital pole, and a smaller left PCA territory infarct involving the medial left temporal lobe. There is regional sulcal effacement with possible trace subarachnoid hemorrhage, but no midline shift or herniation." Montoya misleadingly "updated"[10] her results at least 4 times in the matter of 20 minutes without the original "updated version" and without any information about what, when and why is being updated. In agreement with the OBH Defendants to conceal critical information about when the tPA infusion started and when it stopped—Defendants have maintained that they stopped the tPA 10 (in other parts 15) minutes earlier and right after the CTA scan results showing brain hemorrhages, Defendant Montoya further concealed information about any other CTA head scans with brain bleeding.

In agreement with either Vista and/or Carmichael and/or Smith and/or Allen and/or Heaton, Montoya seeking information to justify the tPA decision (and concealing information about brain bleeding), wrote: "In retrospect and in light of subsequent CT head findings, mild irregularity of the distal basilar artery may be due to residual thrombus that has otherwise dispersed, followed by repeated

---

[10] The radiology Defendants excluded all of the original versions of their addendums and omitted any information regarding their numerous "updates," e.g. reason for the update, correction, or addendum, what information was updated and why the information was updated.

readings of patent vessels and no occlusion anywhere to be found." In other words, all clots must have been dispersed as there weren't any in Montoya's updated rad exams, just as there weren't any before the tPA. Montoya again muddled the time of reading and the time of the prior compared test—falsely she was comparing to a test taken at 22:08 when she was comparing to a much earlier test. Moreover, because the OBH Defendants had to discontinue the tPA infusion after the Decedent lost consciousness, order a CTA brain scan and re-start the tPA after rad results confirming lack of brain bleeding, Montoya's false report, after the fact, was critical in supporting the OBH Defendants' false accounts of a perfectly standard by-the-book care when they did not even bother to analyze any of the CTAs scans at the time the Decedent lost consciousness all the way until 22:27-22:47 when Defendant Montoya came to the succor of the OBH Defendants to write strictly about lack of current occlusions and speculating about a large occlusion that the tPA must've dispersed.

Defendants Patel and Montoya further concealed information about the Decedent's EKGs to enable the OBH excised records to contain 4 (four) alleged EKGs for the alleged reasons of just "weakness" or just "post-intubation." The OBH produced 1 (one) of these, which was analyzed falsely once, several days later, to show an Abnormal EKG falsely at 21:54 for an EKG that was allegedly taken between 21:34 and 21:54.

Plaintiffs have repeatedly alleged in great detail that the OBH Defendants and Defendant Heide grossly and wanton disregard of the Decedent's life left the tPA infusion to run for at least 60 minutes after the bolus tPA injection, long after the Decedent lost consciousness minutes after the bolus tPA, against a myriad of protocols and guidelines by the American Heart Association, the American Stroke Association and against the tPA manufacturer's own instructions. DE 100, p. 40-50. The American Heart Association (AHA) guidelines for the early management of patients with acute ischemic stroke emphasize that if a patient experiences a severe headache, acute hypertension, nausea, vomiting, or a worsening neurological examination, the tPA infusion should be discontinued, and an emergency head CT scan should be obtained. Loss of consciousness falls under the category of a worsening neurological examination. When a patient receiving tPA (alteplase) infusion loses consciousness, the infusion must be stopped immediately. Loss of consciousness during tPA infusion can indicate a potential complication, such as Intracranial hemorrhage (ICH), a serious and feared complication of tPA treatment, where bleeding occurs in the brain. Yet, the Decedent's tPA infusion was never stopped and continued until at least 22:26—the OBH records lack even a fake order to stop the tPA.

Against basic stroke care protocols, the OBH records do not a precise time for the Decedent's bolus[11] tPA and further conceal the time when the tPA infusion ended. Against basic stroke care protocols, Heide and the OBH Defendants faked consent, reports, exams, tests, scores, among other falsifications, and concealed exams, reports, tests, scores, vital signs information, any information on the Decedent's evolving brain hemorrhages from about 10 pm until 1 am, among other concealments. [12] In this context, the Radiology Defendants' concealments of multiple rad reports, concealments of actual times of rendering and updating tests, concealments of nature or times of referred tests, concealments of reason for or nature of repeated amendments, false references to prior tests and concealments of information that might operate against the OBH Defendants' actions reasonably infer that Defendant Patel and Defendant Montoya each entered into an agreement with at least one of the OBH individual Defendants to falsify the Decedent's medical records with the intent to hide the Decedent's grossly negligent care, avoid liability and mislead Plaintiffs or anyone else who looked at the records. DE 100,

---

[11] Plaintiffs have repeatedly alleged that the bolus tPA was overdosed, wrongly reconstituted and ran for over 1 minute.

[12] And Defendants did so to mislead anyone who would look at the records, avoid liability and preclude litigation, while knowing that Appellant Fist is an attorney. "You're the lawyer, right. What are you, a doctor now?". DE 100 ¶ 67.

p. 43-46, 50, 52, 74-76. The Radiology Defendants' fraud[13] in civil conspiracy and civil obstruction of justice in civil conspiracy (apart from their negligent and/or gross negligent care) caused Plaintiffs severe injuries, including the Decedent's painful and protracted death. DE 100, p. 20, 67-68, 80, 83, 86, 88, 101, 103-105.

Wherefore, Appellants have plausibly alleged the claims of fraud, civil obstruction of justice and the subsumed claim of civil conspiracy against these Appellees.

## 3. NOT SUBSUMED CLAIMS

Unlike civil conspiracy, most of the claims subsumed under wrongful death were not subsumable under the circumstances of this case. Contrary to the district court's decision, Appellants have not argued that "the wrongful death statute only "encompasses damages arising from one injury by one provider, rather than sequential injuries at the hands of 5 different providers." DE 124 at 12. Appellants instead have maintained since May of 2024 that where there isn't a single, unquestionable cause of death, because the Decedent was mistreated by multiple providers, 5 (five) providers here, for expanding brain hemorrhages and brain edema over 4 (four) days at 3 locations (the OBH, the EastCare ambulance, and the

---

[13] Including constructive fraud, as the Decedent was the patient of these negligent Appellees and there was a confidential relationship between Appellant Shkodrov and these Appellees.

CRMC), there isn't a single, unquestionable cause of death, especially when all Defendants have forcefully maintained lack of any wrongdoing. Appellants have further argued that *State Auto Ins. Co. v. Blind*, 185 N.C. App. 707, 713, 650 S.E.2d 25, 29 (2007) is inapplicable under the circumstances of this case and dismissal of medical malpractice/gross negligence and wanton conduct would be premature here based on the 2- year statute of limitations for wrongful death. *State Auto Ins. Co. v. Blind*, 185 N.C. App. 707, 713, 650 S.E.2d 25, 29 (2007) ("when **a single** negligent act of the defendant causes a decedent's injuries and those injuries **unquestionably** result in the decedent's death, the plaintiff's remedy for the decedent's pain and suffering and medical expenses lies only in a wrongful death claim."—the case was about one automobile accident that caused singlehandedly and unquestionably caused the decedent's death at the scene of accident) (highlighting mine); see also N.C. G. S. § 28A-18-2 "Death by wrongful act of another; recovery not assets. (a) When the death of a person is caused by a wrongful act, neglect or default of another, such as would, if the injured person had lived…" But the Decedent did not die at the Outer Banks Hospital and given significant gap in the Decedent's medical treatment—the entire EMS records are missing—each other Defendant can argue, as they have done already, that none of them did caused the Decedent's death—it was either un unfortunate accident, or if needed, the EMS EastCare's fault. But given Defendants' refusals to render the

EastCare medical records, Appellants would be unable to prove that they caused the Decedent's death. DE 74 at 12-13, DE 76 at 11-12.

Furthermore, as to Eastern Radiologists, Appellants have further argued that corporate negligence and negligent supervision, which relate to failures to establish, develop and adhere to protocols for proper assignment of radiologists (Defendant Patel is an abdominal radiologist resulting stroke tests) or fraud prevention, including e.g. prevention of concealments of tests, are separate failures which do not arise from medical malpractice—these failures do not "arise from the same facts and circumstances as a claim for furnishing or failing to furnish professional health services." *Estate of Savino v. Charlotte-Mecklenburg Hosp. Auth.*, 375 N.C. 288, 296 (2020).

Appellants have sufficiently alleged their claims against these Appellees: attacking Appellants' complaint or mischaracterizing the record below do not result in a deficient complaint or a correct district court decision. The purpose of law, among other functions, is to right wrongs. And wrongs were done and overdone here. Counseled Appellees' gamely skills, juxtaposed with Appellants' lack of expertise or experience in the applicable fields of law, sadly do not delete the egregious and extensive nature of the wrongs committed in this case.

## IV. CONCLUSION

Based on the foregoing, Appellants pray that this Court reverse the district court's dismissal of their complaint and remand to a different judge with a different judicial assistant for further proceedings.

Respectfully submitted by,

/s/, Petra D. Fist                                  /s/, Blagomir Shkodrov

Petra D. Fist/Pro se                          Blagomir P. Shkodrov/Pro se

July 16, 2025

## CERTIFICATE OF COMPLIANCE

I, Petra D. Fist, hereby certify that this informal Response Brief complies with the type-volume limits as it contains 4551 words, excluding exempted cover page, table of contents, signature block, certificate of compliance, certificate of service. Fed. R. App. Pr.  32(a)(7)(B)(ii); Fed. R. App. Pr. 32(f). This informal Response Brief also complies with the typeface requirements as it uses a

proportionally spaced face of 14-point Times New Roman. Fed. R. App. Pr. 32(a)(5)(A).

/s/, Petra D. Fist

Petra D. Fist/Pro se

## CERTIFICATE OF SERVICE

I, Petra D. Fist, hereby certify that on July 16, 2025, the foregoing Appellants' Informal Reply Brief to the Response Brief by the above-described Appellees is being filed with the Clerk of Court via the CM/ECF system. All Appellees participate in the CM/ECF system, which automatically and simultaneously transmits to them each of Appellants' filing, including the instant Informal Reply Brief. Wherefore, no separate service was completed.

/s/, Petra D. Fist

Petra D. Fist/Pro se

Email: pdkfist@gmail.com

Tel. 302-525-9302

Address: 1209 Kirkwood Hwy., Wilmington, DE 19805